**Bert L. WOLSTEIN and Lady Iris Corporation, Plaintiffs,**

v.

**Larry BERNARDIN and Jane Doe Bernardin, husband and wife, Michael Stanfield, Norman Docteroff, Manuel Charach, and Manuel Charach as Trustee of the Manuel Charach Revocable Trust, Defendants.**

No. C93–678C.

United States District Court,
W.D. Washington,
at Seattle.

Nov. 15, 1994.

Hall Baetz, Joseph David Weinstein, Ladd B. Leavens, Davis Wright Tremaine, Seattle, WA, for plaintiffs.

Larry Bernardin, pro se.

Howard M. Goodfriend, Edwards, Sieh, Wiggins & Hathaway, P.S., David Arthur Leen, Leen & Moore, Seattle, WA, for defendant.

## MEMORANDUM AND ORDER GRANTING PLAINTIFFS' MOTION FOR RECONSIDERATION

COUGHENOUR, District Judge.

Once in a great while, the Court is called upon to consider whether to grant the extraordinary remedy of default for persistent, willful, and prejudicial abuses of the discovery process. The consistent pattern of discovery abuses in this case, however, continuing even in the face of court orders and monetary sanctions, compels the Court to find two defendants in this action in default.

### I

This action arises from the failure of Burger Boat, a Wisconsin corporation, to perform on its approximately $5 million contract to build a boat for Bert Wolstein, an Ohio resident. At the time it entered into the contract to build the Lady Iris for Wolstein, Burger Boat was the subject of a leveraged buyout by Tacoma Boat, a Washington corporation. Tacoma Boat's purchase of Burger Boat and Burger Yacht Sales (collectively, the "Burger companies") was financed by Norman Docteroff and Manuel Charach, both of whom served on Tacoma Boat's board of directors. The promissory note for their $3 million loan to Tacoma Boat was secured by the assets of the Burger companies and bore interest at the rate of 12% per annum. Wolstein alleges that Tacoma Boat, at the behest of Docteroff and Charach, raided the assets of Burger Boat, including several million dollars paid by Wolstein in progress payments on the vessel Lady Iris, to satisfy the debts to Docteroff and Charach. Ultimately, as a result of defendants' diversion of Burger Boat's operating capital, including Wolstein's progress payments, Burger Boat ceased operations, leaving the Lady Iris unfinished and Wolstein millions of dollars poorer.

Docteroff's and Charach's defense to these charges, to the extent relevant to this motion, centers on their assertions that, as directors, they cannot be held personally liable for Wolstein's claims, and that they acted in good faith and in the exercise of their sound business judgment.[1]

---

1. Although this motion does not reach the underlying merits of the dispute, the Court notes that

in response to Docteroff's and Charach's motion for summary judgment, Wolstein presented con-

It is against this backdrop that the discovery issues have developed. The defendants' abusive practices involve both depositions and requests for production.

### A

Beginning in March, 1994 Wolstein's counsel made several efforts to schedule the depositions of Docteroff and Charach. Because Docteroff is a resident of New Jersey and Charach is a resident of Michigan, scheduling the depositions in a convenient manner required the cooperation of counsel for all parties and of the parties themselves. Wolstein's efforts to schedule mutually convenient depositions prior to mediation were, however, met with a variety of evasive tactics.

First, the defendants responded by requesting and receiving courtesy continuances, although Wolstein offered to conduct the depositions in areas convenient for defendants and defense counsel, Robert Nathan of Southfield, Michigan. Then, after obtaining a continuance to an undetermined date, Nathan simply failed to return the phone calls of Wolstein's counsel, thus preventing a mutual rescheduling of the depositions. In a phone conversation on April 26, Nathan could not suggest any dates upon which defendants would be available for depositions.

On May 4, Wolstein renoted the depositions of Docteroff and Charach for May 11 and 12 in Seattle. These dates coincided with a mediation scheduled for May 13. On May 11, defense counsel sought a continuance of the mediation, to which Wolstein and his counsel agreed despite having prepared for the mediation and made travel plans. No continuance of the depositions was either sought or granted, nor did Docteroff and Charach move to quash the depositions.[2] Defendants nevertheless failed to appear for the scheduled depositions.

In late June, the mediation was rescheduled for August 11, based on defendants' availability on that date. Wolstein's attorneys attempted to reschedule Docteroff's and Charach's depositions either for August 2 and 3, to coincide with the deposition of Wolstein in the Midwest, or for August 9 and 10 in Seattle. Defendants declared their unavailability on any of these dates. Wolstein renoted Docteroff's and Charach's depositions for August 9 and 10 in Seattle, and defendants moved for a protective order.

The Court, gaining an awareness of defendants' apparent strategy of avoiding depositions prior to mediation, issued two orders. First, the Court issued an order stating that "defendants Norman Docteroff and Manuel Charach are ORDERED to appear in Seattle on August 9 and 10, 1994, in accordance with plaintiffs' deposition notices." Minute Order (August 5, 1994). Second the court issued the following order:

> Pursuant to Local Civil Rule 39.1(c)(4)(E), parties are required to attend mediation sessions. Defendants Norman Docteroff and Manuel Charach are therefore ORDERED to attend the mediation scheduled for August 11, 1994. Moreover, defendants Docteroff and Charach are fore-

---

siderable, if incomplete, evidence to support his claims. Specifically, Wolstein offered evidence that (1) the corporate books of Burger Boat were prepared in a way that concealed the fact that the Tacoma Boat's debt to Charach and Docteroff was "pushed down" to Burger Boat, (2) Tacoma Boat recorded its payments to Charach and Docteroff as loans to Burger Boat, which may have concealed Burger Boat's true financial condition, (3) Tacoma Boat retained a refund from an engine manufacturer which should have gone to Burger Boat to be credited to Wolstein, (4) directors and officers of Tacoma Boat misrepresented the condition of Burger Boat in order to induce Wolstein to continue making progress payments, despite possessing knowledge that Burger Boat was unable to complete the contract, (5) Wolstein's progress payments to Burger Boat were diverted to Tacoma Boat and paid to

Docteroff and Charach, and (6) Docteroff and Charach were personally aware of the diversions.

**2.** The only evidence in the record concerning the defendants' failure to appear is in a declaration of Jessica Goldman (August 5, 1994), which states that the defendants "did not appear for their noted depositions on May 11 and 12, 1994, nor did they seek a protective order to quash these depositions." At the show cause hearing on the present motion to reconsider, local counsel stated that she believed that the depositions had been mutually canceled because the mediation was called off. Counsel also conceded that she could point to nothing in the record to support her assertion. The Court considers the sworn affidavit of Jessica Goldman to be the best evidence.

warned that failure to attend the mediation will result in default being entered against them. *See generally Adriana Intl. Corp. v. Thoeren,* 913 F.2d 1406, 1412 n. 4 (9th Cir.1990) (dismissing a defendant's answer and entering default for failure to abide by court orders is within the district court's inherent powers.)

Minute Order (August 10, 1994).

Despite the Court's direct and unambiguous order to attend the depositions on the two days prior to the scheduled mediation, the defendants did not appear. Shortly after 5:00 pm on August 8, the eve of Docteroff's deposition, defendants' local counsel informed Wolstein's counsel that "Mr. Docteroff's schedule does not allow him to make the trip for his deposition." Letter from Robin W. Phillips to Jessica L. Goldman (August 8, 1994).[3] On August 9, defendants' local counsel further informed Wolstein's counsel that Charach was not available for his deposition on August 10, but offered to reschedule the deposition for a time after the mediation.[4] Between the time of the Court's order and the time the depositions were ordered to take place, defendants made absolutely no attempt to contact the Court. No motion was filed, no telephonic conference was sought, no letters were received.

On August 10, the Court held a telephonic conference concerning defendants failure to appear for the Court-ordered depositions. During that conference, counsel for defendants vaguely described business scheduling conflicts, but provided little in the way of a concrete explanation for defendants' refusal to comply with the Court's order.

**3.** In this same letter, defense counsel describes plaintiff's "insisten[ce] that these depositions go forward as ordered" as "hard-line[d]" and "unreasonable."

**4.** The correspondence between the parties indicates that at some point on August 9, the mediation was rescheduled for August 12, and that defendants offered to allow the deposition of Docteroff on August 11, prior to the mediation, and the deposition of Charach after the mediation on August 12. Letter from Phillips to Goldman (August 9, 1994). Another letter on the same day, however, "confirm[s]" that the mediation was set to go forward on August 11 and

The attempt to mediate was, not surprisingly, fruitless. Plaintiffs moved for sanctions. In response to this motion, defendants argued that their conduct in avoiding the Court-ordered depositions was excused. Charach submitted an affidavit of his physician, Dr. Steward Epstein. Dr. Epstein stated that

> On August 8, 1994, Manny Charach told me he was not feeling well and that he was supposed to travel to Seattle, Washington on August 9, 1994. I told Mr. Charach, that traveling to Seattle prior to August 10, 1994, may have a substantially negative impact on his health and I advised him not to travel to Seattle prior to August 10, 1994.

Affidavit of Stewart Epstein, D.O. (August 17, 1994).[5] Docteroff testified in his affidavit that

> In June, 1994, a meeting between extremely important clients, suppliers and myself was coordinated between the parties attending. After adjusting of schedules, cancelling of meetings and vacations, the meeting was scheduled for August 8th through 10th in California. The nature of the business to be conducted at the meeting was critical and of the highest priority of my business.

Affidavit of Norman Docteroff (August 17, 1994).

In an exercise of some restraint, the Court entered a second Order compelling the defendants' appearance for their depositions, granting Wolstein's request for attorneys fees and costs associated with the motion for sanctions, but denying further monetary sanctions. Minute Order (August 30, 1994).

states that defendants would not be available for their depositions until the 12th and 13th. Letter from Phillips to Hall Baetz (August 9, 1994).

**5.** Because Dr. Epstein's affidavit does not elaborate on the nature of Charach's illness, the Court is unable to evaluate why Charach was too ill to travel on August 9, but was well enough to travel on August 10. Dr. Epstein notes in a subsequent affidavit that Charach passed a kidney stone after returning from Seattle. None of this information, however, was presented to the Court until long after Charach's flat refusal to appear as ordered.

Wolstein deposed Charach and Docteroff during the first week of September. Plaintiffs' counsel questioned both Charach and Docteroff about their failure to appear for the Court-ordered depositions in August. Charach testified that he "could not make it" for the deposition because his wife was sick. He testified that he did not discuss with anyone other than his attorney his inability to attend the deposition. Notably, Charach mentioned nothing about a conversation with Dr. Epstein or any other doctor to the effect that he should not travel, nor did he attempt to correct any errors in his testimony following the colloquy regarding his failure to appear, even after consulting with his own attorney at the invitation of Wolstein's counsel.

Docteroff testified that the reason he failed to attend his Court-ordered deposition was that he was at a Warehouse Entertainment trade show, at which his company had a booth. He testified that he was meeting with several hundred store managers and "walking around" the trade show. He further testified that he met with the chairman of Warehouse Entertainment, and other chairmen and senior partners at a restaurant. He stated that he had no written record of any scheduled meetings, no entries in a diary or calendar. Rather, he testified, "I knew they would be there, they knew I was going to be, and I said I'll see [you when] I get out there, we'll have some lunch, dinner, a few drinks. That's the way—there was no—this is not formal meetings."

**B**

Defendants have displayed a similarly cavalier disrespect for requests for document production. Wolstein served upon Docteroff and Charach interrogatories and requests for production which were due April 25 and 26, 1994. After notifying defense counsel that the due date had passed, plaintiffs indicated that a motion to compel would be filed. Letter from Goldman to Nathan (May 4, 1994). Defendants did not respond to the motion to compel, but on May 18 they served responses to the interrogatories and requests for production.

As to the interrogatories, defendants offered general objections based on attorney-client privilege and the like, and provided one-line substantive responses, the essence of which was "unknown" or "not determined at present time." The responses include unsigned and unsworn "affidavits" of Charach and Docteroff testifying to the truth of the answers. Although these responses were clearly insufficient, the Court refrained from reaching the issue because the parties had not met and conferred as required by Local Civil Rule 37(g).

After Wolstein repeatedly requested that the answers be amended, the defendants supplied supplemental responses to the interrogatories, stating that Docteroff and Charach knew of no one who had any knowledge of the facts related to the claims and defenses and further stating that no documents were being withheld on the basis of work-product or attorney-client privilege, or on any other basis. Again, the interrogatory responses were accompanied by unsigned, unsworn "affidavits" testifying to their truth.

As to the requests for production, defendants apparently made no attempt to produce responsive documents in the possession of accountants and attorneys, despite the fact that these documents are within their control. Moreover, defendants persistently failed to deliver the documents they were willing to produce. On May 23, Wolstein's counsel requested that defense counsel arrange for the copying of defendants' documents. Letter from Goldman to Nathan (May 23, 1994). Sometime later, Goldman requested that the documents be mailed to her offices in Seattle, as counsel had been unable to pick the documents up from Nathan's office in Michigan. Letter from Goldman to Nathan (June 21, 1994). Another letter requesting the documents followed on July 5, 1994, and yet another on July 12, 1994. Wolstein's attorneys received the documents on July 15.

Further letters were exchanged between counsel regarding the sufficiency of the production of documents. Despite Wolstein's counsel's exercise of patience in awaiting appropriate responses to her inquiries, she received no reply on the issue from defendants. When the matter was then raised at the parties' depositions, it became abundantly

clear that defendants had simply not looked for the requested documents. Docteroff, in response to questioning about whether records of information he had received as a member of the board of directors of Tacoma Boat would be in his files, stated "I could have them somewhere. If you ask me to, I'd have to look for them, I'd have to break apart millions of boxes." He stated that he had produced no personal bank account records for 1989 and 1990 because he did not know where to look for them.[6] Finally, Docteroff stated that he was "sure" his attorney, Nathan, had requested that documents in the possession of · his accountant be produced, when in fact there is absolutely no indication that such a request was ever made. Indeed, Charach testified more recently, on behalf of himself and Docteroff, that "[Nathan] advised us to produce only documents in our immediate possession rather than search elsewhere for responsive documents." Declaration of Manuel Charach (November 3, 1994) (filed in connection with defendants' premature motion for reconsideration of this Order).

## II

Upon completing the depositions of Docteroff and Charach, Wolstein moved for reconsideration of the earlier motion for sanctions filed in connection with defendants' failure to appear for the Court-ordered depositions in August, 1994. Wolstein argues that the remedy granted by the Court on the motion for sanctions—a second order compelling the defendants' appearance for depositions and granting an award of attorney fees—was demonstrably inadequate in light of both the conduct prior to the depositions and the conduct which was ultimately revealed during the depositions.

The Court ordered defendants to respond to plaintiffs' motion to reconsider, and later ordered defendants to show cause why judg-

ment in the form of default should not be entered against them. Defendants Charach and Docteroff filed affidavits in response to the motion.

Charach testifies in his affidavit that he was confused when he stated during his deposition that the reason he did not appear for his August 10 deposition was that his wife was sick. In fact, he testifies, it was his wife's illness which rendered it difficult for him to appear for the second Court-ordered deposition on September 2. He states that he inadvertently gave incorrect answers during the September 2 deposition because he was confused. The Court is unable to find, however, that Charach has cleared up the "confusion." First, he conferred with his attorney immediately after making the statements he now asserts were simply incorrect, yet made no attempt to correct the deposition testimony. Second, Charach also stated in his deposition that he had no discussions with any doctors regarding his inability to appear on September 2, but he testifies now that he "had to get a letter from [his] wife's doctor verifying the surgery" which prevented him from appearing on that date.

Docteroff, for his part, admits to no confusion in his affidavit filed in response to the Court's order to show cause. Rather, he testifies that his earlier affidavit stating that he did not appear in August because he had scheduled meetings with extremely important clients and suppliers is consistent with his deposition testimony that he was attending informal meetings with people at a trade show. The Court is unimpressed with Docteroff's assertion that the earlier affidavit is consistent with his deposition. The affidavit testimony may not constitute an outright lie, but it is an affront to the concept of fair administration of justice to suggest that informal meetings over drinks at a trade show constitute the type of exigency justifying willful disobedience of a Court order.

---

**6.** Docteroff further made repeated references in his deposition to having destroyed personal financial records after two-and-a-half to five years and to having no personal records whatsoever of millions of dollars in investments, loans, and large acquisitions of stock. The Court is in no position at this time to judge the credibility of these assertions and accepts them, as well as

Docteroff's purported reasons for destroying the documents, as true for purposes of the issues decided here. Docteroff's overall conduct during the course of discovery, however, along with the Court's common-sense notions of how a reasonable person might manage records of million-dollar financial transactions, leads the Court to regard Docteroff's testimony with some concern.

The Court scheduled a hearing on the motion for reconsideration and the Court's sua sponte order to show cause. Remarkably, neither of the defendants nor Robert Nathan, their lead counsel, appeared for the hearing. Instead, defendants dispatched their local counsel to defend what the Court considers to be the indefensible.[7]

## III

■ Federal Rule of Civil Procedure 37(b)(2)(C) provides that the Court may enter a judgment of default against a party who disobeys discovery orders. Similarly, the Court retains the inherent power to impose sanctions for discovery abuses that may not technically violate the rules of discovery. *Halaco Eng'g Co. v. Costle,* 843 F.2d 376, 380 (9th Cir.1988). The choice to render such a drastic sanction rests within the discretion of the Court, provided the disobedient party's non-compliance was due to willfulness, fault, or bad faith. *Fjelstad v. American Honda Motor Co.,* 762 F.2d 1334, 1337 (9th Cir. 1985).

## A

■ As a preliminary matter, several avenues of avoiding the sanction of default are unavailable to defendants. First, the Court is not confined to consideration of only the conduct which occurred after the first order to appear. *See Henry v. Gill Ind., Inc.,* 983 F.2d 943, 947 (9th Cir.1993). Rather, the Court considers all of defendants' discovery conduct in determining whether to grant the remedy of default judgment. *Adriana Int'l Corp. v. Thoeren,* 913 F.2d 1406, 1411 (9th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1019, 112 L.Ed.2d 1100 (1991); *Halaco Eng'g,* 843 F.2d at 381 n. 2.

■ Second, the Court need not treat prior refusals to appear as purged by the ultimate submission to the depositions. "Belated compliance with discovery orders does not preclude the imposition of sanctions." *North*

*American Watch Corp. v. Princess Ermine Jewels,* 786 F.2d 1447, 1451 (9th Cir.1986); *Henry,* 983 F.2d at 947.

■ Finally, the Court finds that defendants' non-compliance with discovery rules and Court orders was the product of willfulness and bad faith. The factual record, as outlined here, speaks for itself and requires little elaboration. The Court notes, however, that it is particularly troubling that, faced with a direct Court order to appear for depositions, defendants simply announced to Wolstein's attorneys that they would not appear. If defendants felt that appearing on the dates ordered by this Court was too great a burden, their sole remedy was to be sought from the Court, not from Wolstein.

## B

■ The Court must weigh five factors before imposing the sanction of default judgment: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Thoeren,* 913 F.2d at 1406 (and cases cited). "Where a court order is violated, the first two factors support sanctions and the fourth factor cuts against a default. Therefore, it is the third and fifth factors that are decisive." *Id.* For clarity, however, the Court makes certain findings and conclusions with respect to each of these issues.

First, the Court finds that the defendants' conduct in this case has harmed both the public's interest in expeditious resolution of litigation and the Court's need to manage its docket. This case is set for trial beginning on November 28, 1994. Defendants have as yet produced only a tiny fraction of the documents requested by Wolstein, and appeared for their depositions a scant two months ago. One of the direct results of defendants' discovery abuses is that this case simply cannot

---

7. Robin Phillips served as local counsel for defendants Docteroff and Charach. The Court considers it unfortunate that Phillips bore the burden of arguing this motion. First, it is clear that Phillips had no control over the defendants or their lead counsel and bore no responsibility for

the stunningly poor strategy decisions that have led to this Order. Second, Phillips' conduct and demeanor at the show cause hearing leave the Court firmly convinced that, had she been in a position of some authority, the situation would not have escalated to this point.

go to trial on the merits on the schedule established by the Court. Indeed, defendants in their premature motion to reconsider generously offer a four-month continuance to allow Wolstein to complete the discovery their own abuses have prevented. It is unnecessary here to explore the mysteries of the pervasive docket crisis in the district courts. Suffice to say that the proposed four-month continuance does little to ease the burden.

Second, the Court finds that the risk of prejudice to plaintiffs is great. The evidence gleaned to date by Wolstein and offered in response to defendants' motion for summary judgment lends some support to his theory of the case. Moreover, Wolstein was able to demonstrate after the depositions that there were serious inconsistencies between the deposition testimony and what other records, declarations, and exhibits show. The Court can only presume, on this record, that defendants have exhibited such recalcitrance for a reason, namely, that "the evidence will not help [their] case." *Securities and Exchange Comm'n v. Seaboard Corp.*, 666 F.2d 414, 417 (9th Cir.1982).

In addition, defendants failure to produce lawfully-requested documents and their willful disobedience of court orders tends to show precisely the type of bad faith which lies at the core of Wolstein's claims. The Court is unable to ignore the apparent consistency between what Wolstein alleges occurred in regard to the merits of the case and defendants' cavalier disrespect for plaintiffs' right to prosecute this case in good faith, for the rules of discovery, and for the Court itself.

Third, the Court finds that no less drastic sanctions will suffice here. Defendants were given ample opportunity, beginning as early as May, to avoid serious sanctions. The Court forewarned defendants early on that failure to abide by the procedural requirements of orderly litigation would result in a judgment of default. Even when placed on notice concerning both the depositions and the mediation, defendants avoided phone calls, evaded discovery requests, and willfully disobeyed Court orders.

Nor did the defendants make a serious effort to rectify the situation when the Court ordered them to show cause why the sanction of default should not be granted. Not until after a hearing on this motion, at which Docteroff, Charach, and their lead counsel, Nathan, elected not to appear, did the defendants come forward with the belated proposal to extend the discovery period, continue the trial, and cover Wolstein's expenditures pursuing these discovery motions. Not until after the hearing on the Court's order to show cause did the defendants admit that they had produced documents only within their immediate possession, rather than documents within their control, and admit that they had been "wrong." The Court is of the opinion that this is not only too little, too late, but that it confirms what has been suspected—that the warnings and lesser sanctions had failed adequately to encourage defendants' compliance.

The Court acknowledges that the public policy favoring the disposition of cases on the merits is not served by an order of default. *Thoeren,* 913 F.2d 1406 (9th Cir.1990). The Court, however, concludes that this factor is substantially outweighed by the others in this instance.

**IV**

Plaintiffs' motion for reconsideration is GRANTED.

The Court hereby finds the defendants Norman Docteroff and Manuel Charach in default and orders that judgment of default on the issue of liability be entered against them. The issue of damages shall be preserved for trial. Attorneys fees and costs associated with the motion for reconsideration are awarded to plaintiffs. Defendants' motion for reconsideration is DENIED.

SO ORDERED.